**In re ERNST HOME CENTER, INC. and EDC, Inc., Debtors.**

**Bankruptcy No. 96–10129.**

United States Bankruptcy Court,
W.D. Washington,
at Seattle.

Feb. 10, 1997.

---

Timothy W. Dore, Seattle, WA,

Dillon E. Jackson, Seattle, WA,

Alan D. Smith, Seattle, WA,

### MEMORANDUM DECISION ON MISCELLANEOUS LEASE ISSUES

KAREN A. OVERSTREET, Bankruptcy Judge.

This Memorandum Decision constitutes the Court's decision on a number of issues related to the retail leases of Ernst Home Center, Inc. (the "Debtor"). These issues have been raised in various motions as described more fully below.

### I. BACKGROUND

The Debtor was one of the leading home improvement, hardware and garden retailers in the northwestern United States. It filed a voluntary petition under chapter 11 of the Bankruptcy Code[1] on July 12, 1996 (the "Petition Date"). At the outset of the case,

the Debtor had over 80 retail store locations in nine different Western states and it employed over 4,000 full and part time employees. In connection with the bankruptcy filing, the Debtor closed 25 of its retail stores, and conducted going out of business sales at eleven of those stores. Subsequently, and by orders of the Court, the debtor began to close additional stores, in an effort to concentrate its efforts in its more profitable locations.

On September 25, 1996, the Court entered an order (the "AOS Order") authorizing the sale of six store locations (the "Assigned Leases") to AOS Investments LLC ("AOS") and the management by AOS of an additional eighteen store locations (the "Managed Leases") pursuant to an agreement (as modified by the AOS Order, the "AOS Agreement"). The AOS Agreement contemplates that AOS will market the Assigned Leases and the Managed Leases to third parties. Unless extended, the deadline for AOS to propose sales of these leases is March 25, 1997.

Meridian Industrial Trust ("Meridian"), in concert with several other landlords, filed numerous objections to the Debtor's motion to approve the AOS Agreement. Meridian objected to the assignment of its lease to AOS. Meridian also argued that the Debtor had breached a continuous operation clause in its lease, and that this breach could not be cured. The Debtor filed a reply, contesting the validity of Meridian's objections.

Prior to ruling on the Debtor's motion for approval of the AOS Agreement, the Debtor and the objecting landlords reached a settlement of the disputed issues. The terms of their agreement were read into the court record and are reflected in the AOS Order. The AOS Order recites that "all objections to the relief requested ... have been resolved, withdrawn or overruled" and approves the AOS Agreement as modified by the terms of the AOS Order. The AOS Order also provides that the Debtor is to make cure payments of "lease arrearages" as a condition of assuming and assigning an Assigned Lease. The Debtor argued that the AOS Order over-

1. Unless otherwise indicated, all Chapter, Section and Rule references are to the Bankruptcy Code, 11 U.S.C. § 101 et seq. and to the Federal Rules of Bankruptcy Procedure, Rules 1001 et seq.

ruled Meridian's objection based on any alleged breach of the continuous operation clause.

Both before and after the consummation of the AOS Agreement, in conjunction with the various going out of business sales, the Debtor attempted to significantly pare down its expenses by implementing substantial cost-cutting measures at both the general corporate and retail store levels. Notwithstanding these efforts, and in spite of the cash generated by its going out of business sales, the Debtor continued to suffer significant operating losses, resulting in a deterioration in value of the estate. Sales were inadequate to stem ongoing operating losses, much less sufficient to generate a profit. As a result, in November of 1996, the Debtor's management determined that a reorganization of the Debtor's business was simply not feasible and that an orderly liquidation or other disposition of its business would yield maximum value for the Debtor's estate and creditors.

The Debtor moved immediately for authority to conduct an orderly liquidation of its assets. On November 22, 1996, the Court approved the Debtor's proposed liquidation plan, which was subject to the later preparation of a liquidation budget (the "Liquidation Budget") showing the Debtor's projected liquidation proceeds and expenses during the relevant period. The Debtor later presented the Liquidation Budget to the Court. The Debtor's major secured lenders and the official unsecured creditors' committee have consented to the budget. The Liquidation Budget contemplates a ten week intensive liquidation period, where the Debtor, using AOS as its liquidation consultant, will conduct going out of business sales of its remaining inventory as well as sales of its furniture, fixtures, and equipment. AOS or its agent is conducting these sales at the Debtor's leased store locations. AOS is also in the process of marketing the Debtor's leasehold interests pursuant to orders of the Court.

## A. The Meridian Motion to Compel.

Meridian leases two store locations to the Debtor, one in Bellingham, Washington, and one south of Seattle (the "SeaTac Lease"). The SeaTac Lease is dealt with in the AOS Order. On November 25, 1996, Meridian filed a motion to require the Debtor to reimburse it for damages allegedly incurred as a result of the Debtor's violation of a continuous use clause in the SeaTac Lease ("Meridian's Motion"). The SeaTac center contains three anchor tenants, including the Debtor and two others. Meridian argued that anchor tenants are important to the operation of a shopping center because they provide the principal draw bringing customers to the center, with the expectancy that a certain percentage of those customers will patronize the other tenants. Three other nonanchor tenants in the SeaTac center allegedly have clauses in their leases that permit them to curtail the payment of rent or terminate their leases in the event that the Debtor's store remains closed for a certain period of time. The Debtor's store at SeaTac has been closed since the Petition Date. Under the AOS Order, AOS has purchased the SeaTac Lease from the Debtor, and has until March 25, 1997, to find a tenant to which it may assign the lease.

Meridian seeks to recover from the Debtor $8,925.30 per month as an administrative expense, commencing in November of 1996. This is the amount by which TJ Maxx, one of its tenants in the SeaTac center, has reduced its rent paid to Meridian as a result of the Debtor's failure to operate its store for 120 days. The TJ Maxx lease further provides that if the Debtor fails to operate its store continuously for 240 days, it may terminate its lease.

The Debtor objected to Meridian's Motion on both procedural and substantive grounds. The Debtor claimed that Meridian was required to file an adversary proceeding in order to recover money or property from the estate. Further, the Debtor argued that Meridian's alleged damages are consequential damages and not "obligations" under Bankruptcy Code § 365(d)(3), that under the terms of the SeaTac Lease Meridian may not recover consequential damages, and that even if the Debtor is liable for consequential damages, those damages are not entitled to administrative expense priority under Bankruptcy Code § 503(b). Finally, the Debtor argued that Meridian waived its right to claim damages for the alleged breach of the

continuous use clause in the SeaTac Lease by consenting to the AOS Order.

At a hearing on Meridian's Motion on December 17, 1996, the Court made its oral ruling denying Meridian's Motion. The Court's written bases for denying that motion are set forth below.

### B. The Motion for Payment of Postpetition Taxes.

On December 4 and December 6, 1996, a number of landlords filed motions seeking payment of postpetition real property taxes as an administrative expense. These landlords include BBF Associates I ("BBF"), landlord for the Debtor's Coeur D'Alene location (the "Coeur D'Alene Lease"); Northwest Rainier, landlord for the Debtor's Great Falls, Montana location; T.F. James Company, landlord for the Debtor's Kalispell, Montana location; and Helena B & E Limited Partnership, landlord for the Debtor's Helena, Montana location. These landlords are hereinafter referred to as the "Tax Landlords." The Tax Landlords argued that the Debtor was required to reimburse them for real property taxes payable as billed after the Petition Date, regardless of whether those taxes accrued prepetition or postpetition.

The debtor objected to the Tax Landlords' motion, arguing that under Section 365(d)(3) it is only required to pay taxes that accrue postpetition and that the taxes sought by the Tax Landlords were prepetition taxes, which the landlords had billed postpetition. Under the terms of the Tax Landlords' leases, the Debtor is required to reimburse the landlords for real property taxes when those taxes come due, on a biannual basis. In Montana, real property taxes for the first half of 1996 came due on November 30, 1996, and real property taxes for the second half of 1996 will come due on May 30, 1997. In Idaho, real property taxes for the first half of

1996 came due December 20, 1996, and real property taxes for the second half of 1996 will come due on June 20, 1997. Under all of the leases, the Tax Landlords pay the taxing authorities directly and the Debtor reimburses the landlords. The parties agree that the Debtor has no independent obligation to pay the real property taxes at issue; the Debtor's sole obligation for these taxes arises under the triple-net feature of the leases.

At a hearing on December 13, 1996, this Court declined to follow a line of cases holding that real estate taxes billed postpetition, regardless of when they accrue, are entitled to payment under Section 365(d)(3). Instead, this Court held that only taxes accruing postpetition must be paid by the Debtor under Section 365(d)(3). In addition, the Court held that the prorated postpetition taxes must be paid by the Debtor on the date required under the applicable lease, denying the Tax Landlords' request that the Debtor be required to pay accruing tax obligations on a monthly basis, notwithstanding the payment terms under the leases.

### C. The Motion of the Unofficial Landlords' Committee for Adequate Protection.

On December, 20, 1996, after approval of the Debtor's plan of liquidation, the members of the Unofficial Landlords' Committee (the "Member Landlords") moved for adequate protection of the postpetition obligations arising under their leases (the "Adequate Protection Motion").[2] A number of other landlords have joined in the Adequate Protection Motion.[3] The Debtor and its subordinated secured creditors, Cerberus Partners, L.P. and Oaktree Capital Management, LLC (the "Subordinated Lenders"), oppose the motion.

The Adequate Protection Motion has two components. First, it seeks an order con-

---

2. The names of the Member Landlords are set forth in Exhibit A to the Second Amendment to Exhibit A to Motion for Grant of Adequate Protection, Etc.

3. *See* Joinders by the Estate of David Hudesman (Nampa, Idaho store), Wesbild, Inc., G.I.R. Properties (Renton, Washington store), Dr. and Mrs. A.L. Washburn, Lewis and Clark, LLC (Helena, Montana store), GE Capital Investment Advisors

(Tigard Towne Square), Strategic Retail Trust (Layton Hills store), Panos Properties, Mona Secord (Highland Hills), TCW Realty Fund IV Holding Co. (Woodinville), TCW Trust (Bear Creek Village), Wenatchee Valley Mall Partners (Wenatchee Mall). The foregoing landlords will not be referred to separately, but will be included in the definition of Member Landlords for purposes of discussion herein.

firming that all amounts paid to the landlords thus far in the case and in the future under Section 365(d)(3) are not subject to disgorgement for any reason, including if the estate should be administratively insolvent. Second, it seeks an order granting adequate protection to the Member Landlords under Section 364(c)(1) for all amounts that are accruing under their leases going forward, including rent, taxes and other amounts. Specifically, as to the latter component of the motion, the Member Landlords want the Court to require that the Debtor create a trust account for their benefit, into which accrued obligations under the leases, including taxes that have accrued but are not yet payable under the leases, will be deposited on a monthly basis. Alternatively, the Member Landlords argue that if they are not granted this form of adequate protection, they believe the time for the Debtor to assume or reject their leases, which presently expires on March 25, 1997, should be immediately terminated.

The Subordinated Lenders argue that the success of the Debtor's going out of business sales, which have already resulted in nearly full payment to the Debtor's first priority secured lender, demonstrates that there is little chance that the estate will be administratively insolvent or unable, through the liquidation proceeds, to pay the Member Landlords' accruing lease obligations in full. Further, the Subordinated Lenders object to the Member Landlords' request for priority under Section 364(c)(1) because that would give the landlords a claim entitled to the same priority as the Subordinated Lenders, who were granted priority under that section in connection with their consent to the Debtor's use of their cash collateral.

Initially, the Debtor's response points out that the Adequate Protection Motion is not supported by any evidence. Indeed, the Member Landlords have not submitted any declarations or documentary evidence in support of their motion. The Debtor has submitted the declaration of its financial consultant, Daniel Scouler, who opines that the estate is administratively solvent and will ultimately return a dividend to unsecured creditors. Further, the Debtor contends that the Member Landlords are not entitled to adequate protection under Section 364(c)(1) because they are not extending credit to the Debtor and they are not entitled to request adequate protection under any circumstances under Section 363(e).

The Declaration of Daniel Scouler ("Scouler Decl."), which the Debtor filed in support of its objection to the Adequate Protection Motion, states that the "Liquidation Budget provides for payment of all postpetition landlord obligations as they become due" under the Member Landlords' leases. *See* Scouler Decl., ¶ 8. Mr. Scouler also states in his declaration that the Debtor has continued to pay all of its accruing lease obligations in full, except where there is a legitimate dispute over amounts owed under any lease (*Id.*, ¶ 4), and that the funds being generated from the Debtor's liquidation sales of inventory and leasehold obligations should be sufficient to enable the company to continue to pay these obligations. *Id.*, ¶ 10.

The Debtor also filed the Declaration of Richard T. Gruber Regarding Liquidation Budget ("Gruber Decl."), in response to questions raised by the Court about the line items in the Liquidation Budget. Mr. Gruber is the Chief Financial Officer of the Debtor. In his Declaration, Mr. Gruber states that accruing real property taxes under the Debtor's leases that become due after April, 1997, are not included in the Liquidation Budget, because the cash projected to be available at the conclusion of the liquidation sale in April and May of 1997 is approximately $10,726,000 (after payment to secured lenders, including the Subordinated Lenders). Mr. Gruber estimates that the amount of accruing postpetition taxes under the leases that are not included in the Liquidation Budget is $433,000. Gruber Decl., ¶ 6. He further states that this amount, plus approximately $350,000 in employee stay bonuses that also are not included in the Liquidation Budget, will be paid when due from the $10 million estimated liquidation proceeds. The Debtor supplemented Mr. Gruber's declaration with his oral testimony at the hearing.

## II. *JURISDICTION*

This Court has jurisdiction of these proceedings pursuant to 28 U.S.C. § 1334 and

this is a core proceeding under 28 U.S.C. § 157.

## III. DISCUSSION

### A. The Meridian Motion to Compel.

#### 1. Meridian's Rights Under Section 365(d)(3).

■ Section 365(d)(3) requires a debtor in possession to

[T]imely perform all the obligations of the debtor ... arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title.

This Court's opinion in *In re MS Freight Distribution, Inc.*, 172 B.R. 976 (Bankr. W.D.Wash.1994), clarified that pursuant to Section 365(d)(3), all obligations of the debtor under a lease, including rent, interest, late fees, and other obligations, must be paid as they become due under the terms of the lease. *See also Pacific–Atlantic Trading Co.*, 27 F.3d 401 (9th Cir.1994). Accordingly, the Court must look to the terms of the SeaTac Lease to determine if the damages sought by Meridian for the Debtor's alleged breach of the continuous use clause constitute "obligations" for purposes of Section 365(d)(1). The Court concludes that these damages, even if proved, do not fall within the coverage of Section 365(d)(3). *See In re R.H. Macy & Co.*, 170 B.R. 69 (Bankr. S.D.N.Y.1994).

■ The legislative history to Section 365(d)(3) makes it clear that the section was intended to assure that landlords would receive current payment under their leases while the debtor determines whether the lease should be assumed or rejected.

[The second] problem is that **during the time the debtor has vacated space but has not yet decided whether to assume or reject the lease,** the trustee has stopped making payments due under the lease. These payments include rent due the landlord and common area charges which are paid by all tenants according to the amount of space they lease. In this situation, the landlord is forced to provide current services—the use of its property, utilities, security, and other services— without current payment. No other creditor is put in this position. . . .

The bill would lessen these problems by requiring the trustee to perform all the obligations of the debtor under a lease of nonresidential real property at the time required in the lease. This timely performance requirement will insure that debtor-tenants pay their rent, common area, and *other charges on time pending the trustee's assumption or rejection of the lease.*

130 Cong. Rec. § 8894–95 (daily ed. June 29, 1984) (remarks of Senator Hatch) (emphasis added). The quoted statement above indicates that Congress clearly contemplated that the debtor may have vacated the leased property prior to assumption or rejection, yet the statement only refers to payment of normal accruing obligations under the lease, like rent and common area maintenance charges. There is no indication that Congress contemplated payment by the debtor of consequential damages for breach of the lease under Section 365(d)(3), like those asserted by Meridian.

■ Nowhere in the SeaTac Lease does it require the Debtor to pay the amount of any reduction in the rent paid by another tenant at the SeaTac center in the event the Debtor's store is closed. In fact, the SeaTac Lease fails to identify any specific remedy of the landlord in the event of a breach of the continuous use clause by the Debtor. This Court concludes that Section 365(d)(3) contemplates obligations that can be identified and quantified by the express terms of the lease, not the kind of damages asserted here by Meridian, which require resort to litigation and proof before both the entitlement to and amount of damages can be determined. Accordingly, the Court will deny Meridian's request for payment of the alleged damages pursuant to Section 365(d)(3).

#### 2. Meridian's Request Under Section 503(b).

■ Meridian also asserts that its alleged damages are entitled to administrative expense priority under Section 503(b), which gives priority to postpetition claims that are actual, necessary expenses of the estate. In *In re Madden*, 185 B.R. 815 (9th Cir.BAP

1995), in order to award attorneys fees to the prevailing party in postpetition litigation with the debtor, the Ninth Circuit Bankruptcy Appellate Panel had to expand the notion of "actual and necessary" to some extent. The court created two categories of administrative expense claims: (1) activities that serve to benefit the estate as specified in the language of the statute itself; and (2) activities that may create an independent obligation of the estate to others, without regard to whether there was a benefit to the estate.

Prior to *Madden,* the rule in the Ninth Circuit was based upon the Sixth Circuit's test, which has been widely adopted by other courts: To recover under Section 503(b)(1)(A), the claimant must prove that (i) the debt arose from a postpetition transaction with the debtor (or that the claimant gave consideration to the debtor postpetition), and (ii) it directly and substantially benefited the estate. *See In re DAK Industries, Inc.,* 66 F.3d 1091, 1094 (9th Cir.1995). *DAK* also held that the terms "actual" and "necessary" must be construed narrowly. This Court concludes that Meridian is not entitled to a claim under Section 503(b) on account of its alleged damages under *Madden* or the pre-*Madden* authorities.

First, Meridian did not enter into a postpetition transaction with the Debtor. The alleged damages at issue arise out of a prepetition lease. That the Debtor continues to occupy the premises under the lease postpetition does not make the lease a postpetition transaction for purposes of Section 503(b). Second, there is no evidence in the record before the Court that Meridian's alleged damages directly and substantially benefited the estate. Meridian argues that by closing its store at the SeaTac center, the Debtor was able to divert the funds that would have been required to operate that store to other uses beneficial to the estate, while maintaining the rights to market the SeaTac Lease at a profit. The sole declaration submitted in

support of Meridian's Motion, however, does not even address these issues.[4]

The *Madden* analysis is more difficult to apply to the facts here. In *Madden,* the debtor filed a prepetition suit in state court against certain trusts for breach of contract. The debtor voluntarily continued that litigation postpetition and lost. The state court entered judgment against the debtor and awarded the trusts their attorneys fees and costs. The Bankruptcy Appellate Panel held that the attorneys fees and costs incurred by the trusts postpetition were entitled to administrative expense status in the bankruptcy proceeding. The court further held that the trusts were not required to show any tangible benefit to the estate, but instead, were merely required to show that the fees and costs were incurred as a result of the debtor's voluntary actions on behalf of the estate.

At the heart of the *Madden* analysis is a determination that the debtor is in fact liable for the claim. That determination has not, and cannot, be made in this case without an adversary proceeding. A determination of Meridian's claim must take into account all of the defenses raised by the Debtor, including that the Debtor has not breached the continuous use clause and that, even if it has, Meridian is not entitled under Washington state law to consequential damages. In any event, this Court concludes that Madden should be limited to its facts and should not be expanded to cover a dispute like this one, where the Debtor's obligations to Meridian are already heavily regulated under Section 365.

### 3. *Waiver and Section 365(b)(1)(B).*

◼ The Debtor argues that by consenting to the AOS Order, Meridian waived its right to damages for violation of the continuous use clause. In connection with the AOS Motion, Meridian argued that the Debtor had breached the continuous use clause, that this breach could not be cured, and that the lease

---

4. Meridian argues that the Debtor received a benefit by selling the SeaTac Lease to AOS under the AOS Agreement. Although the Debtor did sell the SeaTac Lease to AOS, there is no specific allocation of value to that lease in the AOS Agreement. Thus, the amount of consideration received by the Debtor for the lease is not appar-

ent from the face of the agreement. Moreover, it cannot be said that the Debtor's ability to breach the continuous use clause permitted the Debtor's receipt of consideration from AOS. If the Debtor had continued its operations at the SeaTac store, it would still have been able to sell its lease to AOS for the same consideration.

thus could not be assumed. This objection was withdrawn. Meridian then consented to the AOS Order, which provides that AOS may market the lease through March 25, 1997, provided that if Meridian can show a "material hardship" or that AOS has failed to diligently market its lease, Meridian may move to compel assumption or rejection after November 25, 1996.[5] In the AOS Order, there was no reservation of the right to assert the Debtor's failure to comply with a continuous use clause during this period of marketing and at no time did Meridian argue that it had the right to assert ongoing damages for violation of this kind of covenant. Meridian, however, did reserve all of its rights in connection with the later assumption and assignment of its leases by AOS under Section 365(b). The AOS Order expressly defers all matters related to assumption and assignment until AOS actually makes a request for assignment by motion.

Once AOS makes a request pursuant to the AOS Order to assume the SeaTac Lease and assign it to a third party pursuant to Section 365(b), the alleged breach of the lease by the Debtor will be squarely at issue. If Meridian shows at that time that the Debtor has breached the lease, under Section 365(b)(1)(A) and (B) AOS must provide adequate assurance that any breach will be promptly cured, and Meridian may claim entitlement to compensation for any "pecuniary loss" resulting from such default. Section 365(b)(1) makes no distinction between prepetition and postpetition defaults. As Section 365(b)(1)(B) does not create an independent right to damages, Meridian will be required to show its entitlement to the damages it asserts under state law principles and the terms of the lease. *See, e.g., In re Westside Print Works, Inc.,* 180 B.R. 557 (9th Cir.BAP 1995). These issues, however, need not be resolved unless and until AOS makes a request to assign the SeaTac Lease.

Accordingly, the Court concludes that Meridian is not entitled to an administrative expense claim at this time, but that Meridian has not waived its right to assert damages for the Debtor's alleged breach of the continuous use clause when a request to assume the lease is made.[6]

## B. The Landlords' Motion for Payment of Postpetition Taxes.

The Tax Landlords claim that because they billed the Debtor postpetition for real property taxes, those taxes constitute Section 365(d)(3) obligations that must be paid immediately. The Tax Landlords rely on a line of cases that interpret Section 365(d)(3) to require the payment of any real property taxes due under a lease, so long as the landlord bills the debtor for the taxes in accordance with the lease after the petition in bankruptcy is filed. This minority of courts is said to have adopted the "billing date" theory. *See, e.g., In re Krystal Co.,* 194 B.R. 161, 162 (Bankr.E.D.Tenn.1996); *In re F & M Distributors, Inc.,* 197 B.R. 829 (Bankr. E.D.Mich.1995); *In re R.H. Macy,* 152 B.R. 869, 873 (Bankr.S.D.N.Y.1993); *In re Duckwall–ALCO Stores, Inc.,* 150 B.R. 965, 976 (D.Kan.1993); *In re Appletree Markets, Inc.,* 139 B.R. 417 (Bankr.S.D.Tex.1992).

■ This Court elects not to follow the minority, and instead adopts the reasoning

---

5. The existence of the alleged monetary loss Meridian now suffers on account of its other nonanchor tenant leases and the possibility that one or more of those tenants may elect to terminate its lease, may constitute "material hardship" under the AOS Order, justifying a date certain for assumption or rejection of the SeaTac Lease. Meridian, however, has not requested that relief here.

6. The Debtor argues that as a matter of law, the damages asserted by Meridian constitute a "penalty" under Section 365(b)(2)(D), which may not be recovered under Section 365(b)(1). This Court disagrees, however, with the Debtor's interpretation of Section 365(b)(2)(D). The word "penalty" applies to both the words "rate" and "provision" with respect to nonmonetary defaults. The damages asserted by Meridian do not relate to a penalty rate or provision. To interpret Section 365(b)(2)(D) in the broad manner advanced by the Debtor to cover all damages for breach of any nonmonetary provision of a lease, would read Section 365(b)(1) right out of the Bankruptcy Code. *But see In re Claremont Acquisition Corp., Inc.,* 186 B.R. 977, 990 (C.D.Cal. 1995) (court holds that nonmonetary default under franchise agreement did not have to be cured prior to assumption). *See also* The Bankruptcy Technical Corrections Act of 1997 (not yet numbered), which was introduced in the House of Representatives for the purpose of clarifying the meaning of Section 365(b)(2)(D) and overruling the *Claremont* interpretation.

set forth by the majority of cases dealing with this issue. The majority of courts have held that real estate taxes which accrue prepetition but are not billed under a lease until postpetition, remain prepetition obligations and are not "obligations" that must be paid pursuant to Section 365(d)(3). The majority recognizes that the intent behind Section 365(d)(3) is to provide landlords current payment for current services, not to accord landlords a windfall by paying a prepetition portion of their claim ahead of other unsecured prepetition creditors.

This Court finds the analysis in *In re Handy Andy Home Improvement Centers, Inc.,* 196 B.R. 87 (Bankr.N.D.Ill.1996), particularly persuasive. In *Handy Andy,* as in this case, the debtor was required under a lease to reimburse its landlord for real property taxes. The landlord in *Handy Andy* sought to compel the debtor to pay, as a Section 365(d)(3) administrative expense, a real property tax bill that came due postpetition for prepetition tax periods. The court in *Handy Andy* reasoned that the landlord elected in its lease to have the debtor pay the tax bill after it was issued and so, by requiring payment at a later date, the landlord essentially extended credit to the debtor/lessee. This is in contrast to rent, which is prepaid monthly. The court further reasoned that to avoid extending credit, the landlord could presumably have provided in the lease that the lessee pay one-twelfth of the anticipated real property tax due at the beginning of each rental month. *See also In re Warehouse Club, Inc.,* 184 B.R. 316, 317 (Bankr.N.D.Ill.1995); *In re All for A Dollar, Inc.,* 174 B.R. 358, 361–62 (Bankr.D.Mass. 1994); *In re Ames Dept. Stores, Inc.,* 150 B.R. 107 (Bankr.S.D.N.Y.1993).

This Court agrees with the majority that the minority's interpretation of Section 365(d)(3) produces results that are inconsistent with the priority and distribution schemes under the Bankruptcy Code. *See In re All for A Dollar, Inc.,* 174 B.R. at 361. To sustain the interpretation urged by the Tax Landlords would permit the Debtor to manipulate rejection dates so as to avoid paying real property taxes that have accrued postpetition, but are billed after the lease is reject-ed. In that circumstance, the result would be very unfair to the landlords.

■ BBF asserts an additional theory for according its tax claim administrative priority. It claims that due to a clerical error by the Kootenai County Assessor's Office, the bill for 1995 taxes was mistakenly sent to the Debtor instead of to BBF. BBF did not receive or pay the tax bill until postpetition. BBF claimed that because the Debtor allegedly admitted its duty to reimburse BBF for these taxes in a postpetition letter, the taxes then became an administrative expense.

This Court orally ruled that the taxes due under the Coeur D'Alene Lease represent prepetition debt and do not have priority status under Section 365(d)(3). Furthermore, any postpetition agreement by the Debtor to pay 1995 taxes due under the Coeur D'Alene Lease was not approved by the Court, and so cannot give rise to administrative expense priority. To permit the Debtor to elevate prepetition claims to administrative expenses via informal agreements, where court approval is not obtained, would prejudice all of the other creditors in the case and thwart the priority distribution scheme under the Bankruptcy Code.[7]

Finally, the Tax Landlords urge the Court to require the Debtor to pay taxes monthly pursuant to Section 365(d)(3), rather than when billed by them. This Court has held that the *character* of the taxes, as pre- or postpetition debt, is determined by the date the taxes accrue. The billing date, however, governs the date the taxes are payable by the Debtor under the terms of the leases. The Tax Landlords want the Debtor to accelerate payment in this case—to go beyond what Section 365(d)(3) requires, which is only that the Debtor "timely" perform the obligations. Section 365(d)(3) does not require acceleration of the tax payments. If the Tax Landlords are concerned about payment of taxes in the future, those concerns can be addressed as part of a motion for adequate protection. This issue is discussed in the following section.

7. Moreover, in this case, the letter relied upon by the landlord does not constitute a binding agree-ment by the Debtor to pay the asserted taxes as an administrative expense.

## C. The Motion of the Unofficial Landlords' Committee for Adequate Protection.

 The Debtor has the burden of proving by a preponderance of the evidence that the Member Landlords are adequately protected. 11 U.S.C. § 363(*o*). Here, the Debtor has offered evidence to show that the projected proceeds from the liquidation of the Debtor's assets will be sufficient to pay all secured lenders in full, leaving in excess of $10 million for payment of any remaining administrative expenses and to return a dividend to unsecured creditors. The Member Landlords have not offered any proof to the contrary. Therefore, the Court finds that the Member Landlords, and the other landlords joining in the Adequate Protection Motion, are not entitled to adequate protection other than the right to receive timely payment of their lease obligations and priority under Section 507(b) if they are not paid.

### 1. The Right to Request Adequate Protection.

This Court held in *MS Freight* that a landlord is entitled to seek adequate protection of its right to be kept current postpetition under Section 363(e).[8] The Debtor urges this Court to reconsider that conclusion based upon an amendment to Section 363(e) that was part of the 1994 amendments to the Bankruptcy Code, which became effective after the *MS Freight* decision. The amendment added the following language to Section 363(e):

> This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362).

The Debtor argues that this language confirms Congressional intent to exclude real property lessors from the ambit of Section 363(e) because otherwise it would have been unnecessary to include this new language relating to personal property leases. The

Debtor argues that this protection is needed for personal property lessors, whose lease payments are not required to be kept current during the first 60 days of the case (*see* 11 U.S.C. § 365(d)(10)), but not necessary for lessors of real property, who must be kept current during that same 60 day period. *See* 11 U.S.C. § 365(d)(3).

The new language added to Section 363(e) was part of the Bankruptcy Reform Act of 1994. Pub.L.No. 103–394, 108 Stat. 4106 (1994). The language was added in connection with the addition of subsection (10) to Section 365(d). Section 365(d)(10) was an attempt to give personal property lessors some of the protections accorded real property lessors under Section 365(d)(3). Pursuant to subsection (10), the debtor must commence timely payments due under a personal property lease to the lessor 60 days after the order for relief is entered in the case. The court may order otherwise, but this must be upon the motion of the debtor, not the lessor. The intent of this new subsection was to retain the debtor's breathing period to make an informed decision about assumption or rejection of personal property leases, while assuring the lessor that after 60 days it will receive its lease payments without having to demonstrate actual benefit to the estate.[9] Section 363(e) makes it clear that the personal property lessor is entitled to adequate protection but not relief from stay.

It is clear from the legislative history to Sections 365(d)(10) and 363(e) that the amendments made by the Bankruptcy Reform Act of 1994 were intended to address specific concerns related to personal property lessors. This Court is not convinced that the amendment to Section 363(e) demonstrates that Congress never intended that real property lessors avail themselves of the right to request adequate protection. There is no mention of real property lessors anywhere in the legislative history to the amendment to Section 363(e). The right to receive

---

8. Other courts have adopted the minority view that landlords are not entitled to seek adequate protection of their interests and must rely solely on the protections granted to them in Section 365. *See, e.g., In re Sweetwater,* 40 B.R. 733 (Bankr.D.Utah 1984), *aff'd,* 57 B.R. 743 (D.Utah 1985).

9. Prior to the amendment, personal property lessors were required to petition the court to require the debtor to make lease payments to the extent the use of the property actually benefited the estate. Section 365(d)(10) was intended to relieve personal property lessors of this burden.

timely payments under Section 365(d)(3) would certainly be a hollow right if the debtor had no possibility of ever making those payments and the landlord was required to wait until the debtor's default before it could enforce that right.

 Accordingly, this Court affirms its view that real property lessors may request adequate protection under Section 363(e).

### 2. *The Need for Adequate Protection.*

The Member Landlords argue that they are entitled to an order giving their claims for accruing taxes superpriority or priority under Section 364(c)(1), or requiring the Debtor to deposit sufficient funds in escrow to cover the taxes. They claim that without one of these forms of protection, they have no assurance that their taxes will be paid when due. The Debtor claims that it will have adequate funds to pay all administrative expenses, including the taxes when they are due, and to return a small dividend to unsecured creditors. The Court must therefore examine the evidence of the Debtor's ability to pay the Member Landlords' taxes.

The Debtor submitted the declarations of Daniel Scouler and Richard Gruber in support of its Liquidation Budget, which at least on its face, shows sufficient funds to pay the taxes when they become due. The Debtor also called Richard Gruber as a witness in support of its position at the hearing. Counsel for the Tax Landlords cross-examined Mr. Gruber, but submitted no other evidence in support of the position of the landlords.

Mr. Gruber testified that the Debtor's liquidation sales thus far have produced proceeds in excess of the estimate in the Liquidation Budget, and that the Debtor's liquidation expenses have been below budget. Mr. Gruber estimated that instead of $10,726,000 in proceeds available for unsecured creditors, as shown in the budget, there will be approximately $12,500,000. Mr. Gruber testified that from the $12.5 million in estimated liquidation proceeds, $2.4 million may be owed to Congress Financial Corporation (the Debtor's primary secured lender) for an early termination fee, $350,000 will be payable to employees for severance and bonus benefits authorized by previous orders of the Court, and $433,-000 in estimated taxes will be payable to the Member Landlords.

The Member Landlords did not offer any evidence to counter the evidence the Debtor submitted on administrative solvency. Instead, the Member Landlords attempted to cast doubt on the Debtor's projection of its liquidation recovery. Mr. Gruber provided credible testimony, however, that the Debtor's projections are reasonable, in some respects conservative, and represent the best estimate of what creditors can expect in this case.

The only area of vulnerability that appears in the budget is in the line item entitled "R.E. Liquidation," which Mr. Gruber testified was an estimate of the proceeds to be received from the Debtor's sale by way of assignment of its leaseholds. That line item shows estimated proceeds paid to the estate of in excess of $12 million in April and May of 1997. Counsel for the Member Landlords questioned the appropriateness of this projection, given that the Debtor has only until March 25, 1997 to move to assume or reject its leaseholds. Counsel pointed out that the March 25, 1997 deadline has not been extended, and that the Debtor's efforts to date in selling its leaseholds, as reflected in the Court record, have not been very fruitful. Nevertheless, Mr. Gruber testified that the estimates provided in the budget line item for "R.E. Liquidation" represented the Debtor's conservative and best estimate of what it can achieve based upon information provided to it by its liquidator, AOS. Mr. Gruber did *not* testify that this estimate was dependent upon an extension of the March 25 deadline. Therefore, the Court accepts Mr. Gruber's testimony and estimate. In the event that the Debtor's performance in the next couple of months is significantly at variance with the Liquidation Budget and Mr. Gruber's testimony, the Member Landlords may request that the Court revisit the issue of adequate protection.

 Adequate protection is not meant to be a guarantee that a creditor will be paid in full. Instead, the Court must determine whether the landlords' interests are protected as nearly as possible against the possible risks to that interest. *See In re Mellor*, 734

F.2d 1396, 1401 (9th Cir.1984); *In re Martin,* 761 F.2d 472, 477 (8th Cir.1985); *In re McCombs Properties VI, Ltd.,* 88 B.R. 261, 267 (Bankr.C.D.Cal.1988). The Debtor is current on payments to the landlords and has shown that it will have sufficient funds to pay the taxes at issue here at the time they become due under the lease terms. Therefore, the Court concludes that the Member Landlords are adequately protected by ongoing current payments to them under Section 365(d)(3) and the additional protection under Section 507(b), should their payments not be made. Having found that the Member Landlords are adequately protected, it is not necessary to determine whether the Member Landlords have a right to priority under Section 364(c)(1), to require that the Debtor escrow funds for them, or to revisit the issue of whether landlords are entitled to superpriority under Section 365(d)(3).[10]

### 3. *The Risk of Disgorgement.*

The Member Landlords argue that they are entitled to adequate protection of amounts accruing under their leases because, if the estate is administratively insolvent, they may face disgorgement of amounts already paid to them during the chapter 11 proceedings pursuant to Section 365(d)(3). The Debtor argues that if the Court finds that the Member Landlords are not entitled to adequate protection because the estate is administratively solvent, this Court should not decide the question of whether payments that have already been made to the Member Landlords are subject to disgorgement. The Debtor is correct, that having found that the estate is administratively solvent, the Member Landlords face no present risk of disgorgement. More importantly, at this point in time, no one has made any request for the return of any amounts paid to the landlords in this case.

The Member Landlords' concern no doubt arises out of a footnote in *In re Leisure Time Sports, Inc.,* 189 B.R. 511 (Bankr.S.D.Cal. 1995). That court incorrectly concluded that this Court had ruled in *MS Freight* that payments to a landlord pursuant to Section 365(d)(3) could be recovered in the case of administrative insolvency. *Id.* at 512, n. 2. *See also In re New Almacs, Inc.,* 196 B.R. 244, 251 (Bankr.N.D.N.Y.1996) (court implies that this Court would require disgorgement of payments made to landlords). That was not this Court's holding in *MS Freight.* In *MS Freight,* the debtor had defaulted in the payment to the landlord and then rejected the landlord's lease. The Court addressed only the payment of the landlord's unpaid administrative expense claim in its opinion. There was no attempt in that case to recover what the landlord had already been paid. At the time the landlord requested payment of its unpaid claim after rejection of its lease, it was not clear that the estate would be administratively solvent, so the Court held that the claim could not be paid. These facts were similar to the facts in the other cases cited by the court in *Leisure Time. See* 189 B.R. at 513. None of those cases involved an attempt by the trustee or debtor to recover payments already made to a landlord pursuant to Section 365(d)(3).

No request for disgorgement has been made here. Therefore, it is not necessary to decide this issue.

### CONCLUSION

For the foregoing reasons, the Court will enter one or more orders consistent with this decision on each of the above motions.

---

**10.** This court already held in *MS Freight* that landlords are not entitled to a superpriority claim in the event that they have an unpaid administrative expense claim as a result of a debtor's failure to comply with Section 365(d)(3). 172 B.R. at 979, 980.