**In re TREESOURCE INDUSTRIES, INC., Debtor,**

**K–4, Inc., Plaintiff–Appellant,**

v.

**Midway Engineered Wood Products, Inc.; Official Unsecured Creditors' Committee/Post–Confirmation Committee, Defendants–Appellees.**

**No. 03–35018.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 3, 2004.

Filed April 12, 2004.

Timothy W. Dore, Ryan, Swanson & Cleveland, PLLC, Seattle, WA, for the plaintiff-appellant.

John S. Kaplan (argued) and Stacey Ravetta, Perkins Coie, LLP, Seattle, WA, for the defendants-appellees.

Before O'SCANNLAIN, RYMER, and BYBEE, Circuit Judges.

RYMER, Circuit Judge:

We must decide whether obligations under the terms of a lease on commercial property to remove a concrete slab and restore the premises to their pre-lease condition arose prior to the trustee's rejection of the lease, and thus should be treated as an administrative expense claim, or upon rejection such that the lessor's claims for damages are unsecured.

K–4, Inc. and Midway Engineered Wood Products, Inc. (Midway) were parties to a nonresidential real property lease. Midway was one of the debtors in the administratively consolidated Chapter 11 bankruptcy cases of TreeSource Industries, Inc. (TreeSource). K–4 requested allowance and payment of an administrative expense claim under 11 U.S.C. § 365(d)(3) for Midway's failure to remove a concrete slab and restore the premises according to the terms of the lease. The bankruptcy court denied the request, and the district court affirmed, holding that Midway's obligations did not arise until the lease was rejected.

K–4 appeals, arguing that the obligation instead arose during the bankruptcy case (post-petition), and before rejection (pre-rejection), thereby entitling it to an administrative expense claim. We agree

with the district court, and as we have jurisdiction pursuant to 28 U.S.C. § 158(d), affirm.

I

In September 1987, the predecessors to K–4 and Midway entered into a non-residential real property lease. The lease contained a maintenance obligation which stated:

Duty to Repair. That the Lessee will, at Lessee's sole cost and expense, keep and maintain the said premises and will return the same to the Lessor in the same condition as the same was in at the commencement of this lease, reasonable wear and tear excepted. Lessor shall have no responsibility for replacement of the roof or any other portion of the buildings.

(Maintenance Obligation).

In April 1997, K–4 and Midway entered into an addendum to the lease which, in relevant part, extended the lease term through October 2002, allowed Midway to construct a new building on the premises, and contained a removal obligation. The Lease stated that "Lessee is granted permission for demolition and construction on the premises consistent with the site plan," and "any additions and improvements to the premises by Lessee after March 1, 1997 shall not become the property of Lessor and shall remain the property of Lessee." The removal obligation stated:

Lessee is granted permission for demolition and construction on the premises consistent with the site plan attached as Exhibit A. Lessor, upon request, will consent to permit filings by Lessee consistent with Exhibit A. Lessor agrees that any additions and improvements to the premises by Lessee after March 1, 1997 shall not become the property of Lessor and shall remain the property of Lessee. Upon termination or expiration of The Lease, Lessee shall remove all fixtures and equipment on the premises and shall, with respect to improvements made after March 1, 1997, remove such improvements, footings, floors, foundations, and shall regrade the premises to natural contours after removing all debris and other incidental material brought onto the premises by Lessee. (Removal Obligation). Midway constructed a building on the premises in 1997.

Also in 1997, Midway burned out weeds, resealed cracks in the asphalt, added painted yellow lines, and installed a handicapped parking sign on the premises. In 1998, Midway shut down its plant on the premises and traffic was minimal on the property after that time. In early 1999, Midway made additional repairs to the premises to induce K–4's consent to an assignment of the lease in connection with a contemplated asset sale. In February 1999, K–4 agreed that Midway reached minimal compliance with its Maintenance Obligation. Ultimately, the lease was not assigned and Midway did not resume its operations on the premises.

On September 27, 1999, TreeSource and twenty-five of its subsidiaries, including Midway, filed voluntary bankruptcy petitions commencing the Chapter 11 case. Through a series of bankruptcy court orders, Midway's deadline to assume or reject the lease was extended until October 31, 2001.

In September 2001, Midway removed the building it had constructed on the premises, but it did not remove the concrete slab or restore the leased premises as required by the lease. On October 19, 2001, Midway rejected the lease by order of the bankruptcy court. On January 11, 2002, the bankruptcy court confirmed Midway's Chapter 11 plan of reorganization.

On February 11, 2002, K–4 filed a motion requesting allowance and payment of an administrative expense claim, and al-

lowance of a non-priority unsecured claim. K–4's administrative expense claims were $155,814.65 for Midway's failure to remove the concrete building slab and restore the premises, and $72,275.01 for Midway's failure to repair and maintain the leased premises. K–4 also sought a non-priority unsecured claim. Midway opposed K–4's administrative expense claim request and the Creditors' Committee opposed K–4's non-priority unsecured claim request.[1]

On March 15, 2002, the bankruptcy court heard argument, and concluded that K–4 was not entitled to an administrative expense claim because the obligations arose only upon termination or expiration of the lease, which occurred upon rejection. K–4 appealed the bankruptcy court's order to the district court. On December 18, 2002, the district court affirmed the bankruptcy court's order, and concluded that the claims for the breach of the Removal Obligation and the Maintenance Obligation were general unsecured claims and not administrative claims. On January 8, 2003, K–4 timely filed a notice of appeal.

## II

■ K–4 argues that a lessee of commercial property is required to perform timely all of its obligations that arise between the start of the lessee's bankruptcy case and the lessee's assumption or rejection of the lease. It reasons that since every claim under a non-residential real property lease that arises during the post-petition, pre-rejection period is an administrative expense, and the Removal Obligation arose during that time period, K–4 is entitled to an administrative expense claim for Midway's failure to satisfy its Removal Obligation.

■ Section 365 of the Bankruptcy Code authorizes the bankruptcy trustee—

or in a Chapter 11 case, the debtor-in-possession—to assume or reject executory contracts and unexpired leases. *See* 11 U.S.C. §§ 365, 1107(a). The bankruptcy code requires that "[t]he trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title." 11 U.S.C. § 365(d)(3). In other words, "[u]ntil the trustee assumes or rejects an unexpired lease of nonresidential real property, the trustee must perform obligations under that lease in accordance with 11 U.S.C. § 365(d)(3)." *Cukierman v. Uecker (In re Cukierman)*, 265 F.3d 846, 849 (9th Cir. 2001). We adopted a bright-line rule that all claims arising from a debtor's nonperformance of post-petition, pre-rejection lease obligations are entitled to administrative expense priority in *Cukierman*. *See id.* at 851:

> Interpreting § 365(d)(3) as a bright-line rule, encompassing all obligations contained in a bargained-for agreement, ensures prompt performance of lease obligations by bankruptcy trustees. The simplicity of this rule prevents delays and disputes caused by uncertainty over whether the provision applies to any given lease obligation. If the trustee fails to perform a lease obligation, the plain meaning of § 365(d)(3) serves to eliminate disputes over whether the claim arising from that nonperformance is entitled to administrative priority, and thus advances the interest of resolving bankruptcy cases expeditiously.

If a lease is ultimately assumed by the debtor, all pre- and post-petition defaults

---

1. K–4 stated that it and the Committee settled all of their issues, and the Committee advised K–4 that it will not participate in the appeal.

must be cured. *See* 11 U.S.C. § 365(b)(1). On the other hand, a rejection creates a breach of a lease deemed to occur immediately before the petition date, thereby giving rise to a general unsecured claim for rejection damages. *See* ·11 U.S.C. § 365(g)(1). "The debtor, however, does not make the decision to assume or reject immediately and in most cases the debtor continues to enjoy the benefits of the contract or lease. If the debtor ultimately assumes, it presumably has to pay all of its obligations . . . ." Douglas G. Baird, *The Elements of Bankruptcy* 127 (3d ed.2001). Conversely, if the debtor ultimately rejects, then all claims arising from a debtor's nonperformance of a post-petition, pre-rejection lease obligation are entitled to administrative expense priority. *See Cukierman*, 265 F.3d at 851. In this case, the issue essentially is when K–4's claim that Midway breached the lease arose because if K–4's claim pertaining to Midway's breach arose pre-rejection, then it is given administrative expense priority; if however, the claim arose post-rejection, then it is given general unsecured status.

Under the terms of the lease, the Removal Obligation arose "[u]pon termination or expiration of The Lease." The termination or expiration of the lease occurred when Midway rejected the lease. Consequently, Midway's obligation, and K–4's claim, did not arise post-petition, pre-rejection. Therefore, the resulting damage action for Midway's failure to comply with the Removal Obligation is treated as a pre-petition general unsecured claim for rejection damages, *see* 11 U.S.C. § 365(g)(1), and not as an administrative expense claim.

This is unlike the scenario in *Cukierman*, which involved unpaid monthly "further rent" obligations. *See* 265 F.3d at 848. In that case, Cukierman had an obligation to pay "further rent," and once he did not pay the "further rent," the lessor had a claim for the unpaid rent. Con-versely, Midway had an obligation to remove the concrete slab "[u]pon termination or expiration of The Lease," therefore K–4 had a claim once Midway failed to perform its obligation at the termination of the lease. The breach, therefore, did not occur pre-rejection.

■ The Removal Obligation is different from tax or rent obligations, for which the relevant time to determine whether the obligation is pre- or post-petition is when the obligations accrue and not necessarily when performance must take place, because the Removal Obligation did not accrue over time. *See, e.g., In re Ernst Home Ctr., Inc.*, 209 B.R. 955, 964 (Bankr. W.D.Wash.1997). The court in *Ernst* reasoned that a landlord who elects to have a lessee pay taxes after the property tax bill was issued, instead of having the lessee pay one-twelfth of the anticipated real property tax at the beginning of each month, was essentially extending credit to the debtor/ lessee. "[T]he *character* of the taxes, as pre- or post-petition debt, is determined by the date the taxes accrue. The billing date, however, governs the date the taxes are payable by the Debtor under the terms of the leases." *Id.; see also In re Almac's, Inc.*, 167 B.R. 4, 8 (Bankr.D.R.I.1994) (adopting the view that rent obligations accrue over time, "regardless of the fortuity of the billing date") (citation omitted). Unlike tax or rent liabilities, which accrue over time, the Removal Obligation accrued instantly—when the lease was terminated.

In addition, K–4's arguments that Midway's Removal Obligation was triggered when it removed the building and that the phrase "upon termination or expiration" conditioned Midway's right to remove the building are unpersuasive. There was nothing in the lease that limited Midway's ability to demolish its own building, and there was nothing in the lease that acceler-

ated Midway's Removal Obligation once it removed the building. Nor is there anything in the lease that would have prevented Midway from removing the building and using the concrete slab in some other way. The relevant requirement was that when the lease was over, Midway was obliged to give the land to K–4 without any of the improvements on it. Midway failed to comply with this obligation when it rejected the lease and returned the land with the concrete slab on it. Further, the lease addendum stated that K–4 "agrees that any additions and improvements to the premises by [Midway] after March 1, 1997 shall not become the property of [K–4] and shall remain the property of[Midway]." The buildings remained Midway's property to remove and did not affect the timing of the Removal Obligation.

### III

 K–4 argues that the Maintenance Obligation partially arose during the post-petition, pre-rejection period and the expense of performing the Maintenance Obligation should be divided pro rata to determine the amount of the administrative expense claim. However, as with the Removal Obligation, the Maintenance Obligation was breached only when Midway rejected the lease. The terms of the lease provide that the premises must be returned in the same condition as at the commencement of the lease. Therefore, if the maintenance were sub-par, and K–4 had any claim, it would only have arisen when the premises were returned. Although the lease stated that Midway had to keep and maintain the premises, the only relevant time that the premises had to be in proper condition was when Midway returned the land—when the lease ended. When Midway rejected the lease, it simultaneously breached this obligation.

As with the Removal Obligation, the Maintenance Obligation is unlike rent or tax obligations because the Maintenance Obligation did not accrue over time. Midway's obligation was to "keep and maintain the said premises and [ ] return the same to the Lessor in the same condition as the same was in at the commencement of this lease, reasonable wear and tear excepted." *See, e.g., Ernst,* 209 B.R. at 964; *Almac's,* 167 B.R. at 8.[2]

AFFIRMED.

---

**2.** K–4 also argues that the proper way to calculate the expense of performing the main-tenance obligation is pro rata, but we do not need to reach this issue given our disposition.